My name is Arundhat Dhali and I represent the plaintiff Monica Guessous, an Arab-American female who traces her ethnicity to the Middle East. I'm also here with Ms. Gayle Coleman of the United States Equal Employment Opportunity Commission, who has filed an amicus in this case. The district judge dismissed my client's hostile work environment claim under Section 81 because the court determined that a comment by the chief financial officer that the people of Dubai are camel people is a stray remark and not evidence of a hostile work environment. In BioLiberto v. Fontainebleau Corporation, this court, in an embunked decision, determined that a stray remark can be evidence of a hostile work environment. More so when in here the remark was made by the chief financial officer or my client's primary and only supervisor. There are also other statements that was made by the chief financial officer in regards to individuals from the Middle East, in this case that they are crooks and corn men, that not all Muslims are terrorists, but most of them are, that the district court simply dismissed because the court determined that corn men and that most Muslims are terrorists are references and inquiries about Islam and Moroccan culture. We believe that is an incorrect position. Those comments are racist comments. They are stereotypical comments.  Moreover, these comments are also actionable under Section 81 in so far as these are remarks about a very particular ethnic group, the Arabs. It was the Arabs that the chief financial officer said are crooks and corn men. It was the Arabs that the chief financial officer said are terrorists. Not all of them, but most of them are. That remark, because he made it towards Arabs, is and comes under Section 81. The district court also dismissed a timely discrimination and retaliation claims under both Section 81 and Title 7 because we were unable to show pretext. We believe that there was evidence in here for pretext when my client was the only client that was terminated for the reasons alleged by the appellee. In this case, lack of work. The only document that the appellees have shown for lack of work is the December 6, 2012 email. The very email that was sent 75 minutes after she had, for the first time, confronted the chief financial officer calling him a racist. That is the only document that they have produced. Now, the court has said that that alone is not evidence of pretext. Could we back up to the Title 7 hostile work environment claim? Sure. As I understood the district court's ruling on that claim, essentially he found that the claim was time-barred under the statute. Why wasn't that correct? Under Title 7, he believed that claim was time-barred. Right. Yes. And we believe, you know, that it was not time-barred for a number of reasons. I had argued that equitable tolling in this case ought to apply on account that they do not have a human resource department, employer-employee manual. And no one told her, essentially, what would be the reporting requirements to make a claim for harassment. And so our position was that insofar as they kind of contributed to the delay, or if their reporting requirement was that a claim of harassment against a chief financial officer must be made to the chief financial officer, that we feel that is at least equitable grounds to toll the statute of limitations under Title 7. Mind you, that claim is timely under 81, though, because 81 has a four-year statute of limitations. Go ahead. Going back to the issue of discrimination and pre-tax, so essentially at this point the defendants and the court believed that we could not show pre-tax because we could not rebut the lack-of-work defense. As I mentioned earlier, that there was only one document showing that there was lack of work, and that's the December 6, 2012 email. No other document has been produced in this case. Considering also that the very person who she complained about, the very chief financial officer, who has a propensity and habit of making racial and stereotypical remarks about folks from Arab, also terminated her. That, we believe, is also sufficient to show pre-tax. What evidence did the employer produce to show they did not have the work to justify retaining her? To the best of my knowledge, the only document, I don't believe they produced anything. There is no written document or memoranda showing that there is lack of work. I mean, they allegedly said there was a spreadsheet. We have not seen it. And I think the chief financial officer, if you look back at the interrogatory responses, I think I asked them, when was the first time you discussed that my client was deemed for termination? According to the interrogatory responses, we decided to have this discussion back sometime in 2011. I asked the chief financial officer, was there any communication, any notes, in regards to her being terminated in 2011? Answer, no. So that brings us to 2012. And in 2012, also the only document they have produced, according to the request for production of documents, again, I made a very specific request. It was my RFD number 19. Produced me all notes, memoranda, documents showing that my client was deemed to be terminated. They produced those two e-mails from December 6, 2012. That is it. That you are being selected that essentially, and it was an e-mail sent from the president, Mary Alexander, sent to a third party, not even internally within the organization, sent to another employer. Do you have any openings for this girl because there's lack of work? That is, we feel that that was the extent of the evidence, for lack of a better word. Was there some testimony from your client that there were occasions when she herself conceded she was not fully engaged in the work? That testimony is actually in dispute. You're right. There is testimony towards that from my client. There is also testimony, and I believe I mentioned this in my reply, where she disputes that. She also said there was a lot of work. When she came back, there was a lot of work. I believe it's in her affidavit also she mentions that one of her coworkers, she said, we're glad you're back. This place has been a mess without you. There's so much work that needs to be done. So I think the issue about lack of work is really in dispute. I don't think it has been conclusively proven. And I see, I think my time is up. All right. Let's hear from Ms. Coleman. Thank you. May it please the Court, this is an appeal from summary judgment, which means that this Court must view all evidence in the light most favorable to the plaintiff, must make all reasonable inferences in favor of the plaintiff, and must leave all credibility determinations for the jury. With respect to the timeliness claim, a hostile environment claim is timely under Title VII if one act contributing to the hostile work environment happened within the limitations period. In this case, there is evidence that Ms. Gassus' supervisor, Wyshenko, engaged in intimidating and overwhelming scrutiny of her work, whether she was working, what she was working on, that he began this one week after he arrived and met with her. But how is that related to any of the race, ethnicity, religion? There are two facts that show that it is related. The first is that when he did first meet with her, when he first came and took the job, in that very first meeting he learned that she was an Arab Muslim woman from Morocco. I understand all that, but then you're pointing to these acts of intimidation and the like, but those are, the other side would argue, are discrete acts, unrelated, just general issues of supervision unrelated to these concerns about race, ethnicity, or religion. Well, yes, except that in that meeting he said to her, Middle Easterners can't be trusted, they're all out to screw you. And the meeting was within or outside of the statute? That was outside, but then one week after telling her this, that Middle Easterners can't be trusted, he started coming out and saying, so, are you working? What are you working on? She testified that he did this every five minutes one day, that in one day he came and checked on her 40 times. Another time he followed her to the copy machine where she was obviously making copies and said, what are you working on? Are you working? Are you still working on this? On another occasion when he gave her an assignment and five minutes later came out to find out if it was done, and it wasn't done because she had been given the assignment five minutes earlier, he started snapping his fingers and saying, come on, come on, Monica, this is not Moroccan time. So the fact that he's linking his excessive scrutiny to these comments that Middle Easterners can't be trusted, they're all out to screw you, and this is not Moroccan time, hurry up, that's the link. That suggests that at least a reasonable jury could find that the reason for this excessive scrutiny that he only did with her was because he didn't trust her because she was a Middle Easterner, Moroccan, linked to her protected characteristics. And then there is testimony, the employer says it wasn't just her, he also was just supervising, and he was supervising Johnson. On page 23 of Johnson's deposition, he testified that Rochenko only checked on him on occasion, nothing like what Gassus is describing. The defendant has argued that this timeliness argument has been waived by the plaintiff, and I'd just like to say the EEOC is not taking a position on waiver, but we do have an interest in seeing that timely discrimination claims are not wrongly dismissed, and there is evidence in this record from which we think a reasonable jury could find that the claim was timely. Turning to the merits of the hostile work environment claim, whether or not this Court rules that the Title VII claim is timely, the same standard applies substantively under Section 1981 and Title VII about what constitutes a hostile work environment, and for that reason the EEOC has an interest in this interpretation as well. The district court in this case mischaracterized what happened to Gassus as simply references to and questions about Islam and Moroccan culture, but in fact what happened, these weren't questions and intellectual discussions, many of the comments were about terrorism, others were blatant insults, and all of them were directed personally at Gassus, expressly because of her protected characteristics. Knowing that she was Muslim, her supervisor came to her and said, I need your input about Muslim terrorists. Why do Muslims hate America? Later told his co-workers, or the other co-workers there, my Muslim employee tried to poison me, and he asked her if all Muslims have a secret language that they can use to communicate with each other. It's important to view a hostile work environment from the perspective of a reasonable person in the plaintiff's position. Here Gassus testified that she knows Muslims were hated, and indeed post 9-11 there has been animus in this country and workplaces against Muslims. Ms. Gassus testified that she felt like an outsider because of this conduct. She felt humiliated. She frequently had to leave work in order to cry. The harasser was her supervisor, and as this Court has noted in Boyer-Liberto, the effect of harassment by a supervisor is heightened. It is true that other cases from this circuit, from other circuits, have expressed harassment, factual instances of harassment involving more conduct, more repeated. However, in Hoyle v. Freightliner, this Court was very clear that those other cases do not set the bar for what constitutes actionable hostile work environment. With respect to the 1981 claim, I don't know that anyone would disagree that these comments are offensive, but the question is whether or not you can combine what are, in my view, ethnicity or religion-based claims with the racial component of Section 1981. What's your position on that? The EEOC does not enforce Section 1981, so I really can't take a position on interpretation of that statute. I know that the plaintiff has submitted a 28-J letter citing a Supreme Court case which does describe the interpretation of Section 1981 and what race means under that statute. We do interpret Title VII, and under Title VII, and we submitted a 28-J letter about this, because the issue did not really come up until after we had filed our brief and the employer filed its brief. We submitted a 28-J letter showing that the law is really pretty well settled. This Court hasn't decided, but every single circuit court that has looked at this question has said that you can bring an intersectional claim, discrimination, on more than one basis. The language of Title VII says that you cannot discriminate based on race or religion or sex or national origin, and that the use of the word or means that Congress meant any or all of these characteristics, and in fact, there is legislative history showing that Congress considered adding the word solely and decided not to do that. So at least under Title VII, it is clear that you can bring a claim for race, national origin, religion, harassment altogether. One form of harassment amplifies the effect of another, and in fact, if you have an individual, most of these cases have been race and sex, but for example, if you have an individual who is a black woman who is bringing a discrimination claim based on the fact that she is a black woman, it is irrelevant that the employer might treat whites the same. You don't look at whites versus blacks and men versus women, because a black woman has a unique experience. Everything is intertwined. You can't separate people that way, and you can't separate harassment that way. If an employer has bias, that bias is infused in everything that employer is going to do. I'm sorry, I see my time is up unless there are more questions. Thank you. Let's hear from the employer. Good morning, Your Honors. May it please the Court, my name is Hans Reedy on behalf of Appalachia Fairview Property Investments, LLC, along with my colleague at counsel's table with me, Lauren McKelvey, who is also on the briefs. First, I want to address the argument was not raised, as EEOC counsel pointed out, by the appellant, that an activity occurred within the 300-day look-back of Title VII. What was raised was an equitable estoppel argument. I don't agree that there's authority to impose some type of equitable estoppel, statutory tolling with respect to Title VII in this instance, on the grounds that appellant argues that there isn't, in what is a small company here, an employee handbook. The authority cited doesn't stand for that proposition, but I'll also pivot more broadly to whether or not any activity related to, was in hostile work environment activity, harassment, was alleged, or is in the record, looking back 300 days from March of 2013, when the charge, the EEOC charge was filed. And there simply isn't any. What EEOC counsel points to is in 2008. When Mr. Wyshenko first came on as CFO and Ms. Gessos, the appellant had been on at FBI for a bit, they had a discussion about, and all of this is in the record, about his business dealings with individuals from Iraq who ripped him off about computers. And then there was testimony that he closely, Mr. Wyshenko, closely monitored her behavior as her boss. Thereafter, that's when that occurred. The charge, the filing, five years, I mean, it's five years later, the EEOC. And it's important to note overarchingly also that the record and the fact application are very important as the case law dictates in these situations. And I'll address Fountainbleu, which stands for that proposition as well, that you have to apply the specific facts of the case. And the facts of this case, when you look at them, Ms. Gessos, you talk about unwelcome and severe and pervasive are two of the prongs for hostile work environment. And she testified that she brought up these conversations all the way through the last one, which occurred by her own admission in 2011. The end of 2011, that's when the last allegedly offensive conversation occurred about Islam, about Middle Eastern culture or current events or any of the topics that are alleged to be offensive, both in the complaint and also in her deposition and in the record. This excessive surveillance, the act that occurs within the 300-day period doesn't have to be egregious. It doesn't have to be terrible. It just has to be a continuation of the harassment so that if it's true that there was excessive surveillance, their position is it ties back to statements that were made and shows that it was motivated by improper ideas. In terms of record evidence, there's no evidence that it continued in the record past 2011. But to address the application, and Judge Lee was laser focused in his opinion, and it's a very good opinion, and he addressed the record evidence and applied the law, and he applied the applicable law, that still holds true even though Fountain Blue came down on bunk thereafter. But to address whether you can bootstrap, say, close supervision afterward, I think you look to Morgan, the railroad case that is cited in the briefs, and there were within, and we made these arguments to the lower court, and Judge Lee addressed it in his opinion, that that case involved, it was a race case, African-American race case, and something along a quote within the lines of, I'll get his or her, quote, black ass. That tied it back and bootstrapped it in, and that's how Judge Lee correctly distinguished it. There's no, this is just supervision, and you have a wide body of law that, look, because he's asking her, because he's asking appellant what she was doing, what assignment she's working on. And looking, and Mr. Johnson actually, it's in his record that, yeah, it was a different management style that he had, it was more hands on, but there's zero nexus in the record or otherwise between that and a small company and statements that were made back in 2008 and through 2011. You can see that there's evidence on the plaintiff that past May 9th, 2012, that he continued to scrutinize her work to a level that was just overbearing, that was dealt with a lack of trust. Do you agree with that? There's evidence that that continued. I disagree. I don't think that there's record evidence that that continued, in fact, but by... You didn't testify to that? She testified, not for that specific temporal, she... The scrutiny, the scrutiny occurred all the way up to the time she went on maternity leave, didn't it? It's part of the facts in the record. Don't put a spin on it, just the facts. Didn't she say that this overbearing scrutiny continued up until the time she went on maternity leave? Yes or no? No, up until the time that she went on maternity leave? He continued to question in terms of that lack of trust, staying on top of her, what are you doing? Didn't she say that? I thought she testified in the record that around the time when she became pregnant, before she went on maternity leave, they didn't really interact and it became cold and they didn't talk much. I thought that was the testimony in terms of that specific point, but that's all I can answer to address that. Well, I guess part of the problem is that that argument wasn't presented to the district court with respect to the intimidation, but what was presented were claims that the acts that allowed the statute to continue to run were her March 2013 termination and her removal of her assignments in November of 2012. Those were the acts that the district court focused on in deciding whether or not the statute had been told and the court said no because those were discrete acts unrelated to the focus of her claim. Isn't that what the district court found? That's exactly right, Your Honor, and the opinion addressed just the record evidence that was in it. I'm not aware which, that's what the summary judgment record is. So yes. So the district court ignored her deposition testimony? No, absolutely not. If he didn't ignore it, then it's in the record. I don't know what the district court relied on. I'm talking about the record right now before us, and this is DeNova. So the record shows that she did testify post-May 9th of this intrusive, overbearing scrutiny of her work. Did it not? In her deposition? You know the record. It's on your counsel's record, is it not? Through May 9th? Past May 9th. Later than May 9th. After May 9th. My apologies. I can't recall that date. I have to defer to Your Honor. So you're saying that there's no testimony that his overbearing scrutiny of her work occurred after May 9th? That would be the cutoff, right? I'm going to the 300-day period. In terms of the close supervision, I don't know if there's a bright-line date in the record as to when that stopped, when she became coal, and they kind of stopped having this close supervision. It's neither here nor there, but it's not affirmatively presented. But you go back to case law also that addresses that. There's also no nexus between that and what occurred. Let me ask you that. The record will speak for itself. The comments that he made about Arabs and Muslims, distrust, you would agree that that was racial or ethnic, religious, animus, direct? That's not circumstance, direct. Do you agree with that? Direct evidence of animus based on religion and ethnicity. Is it or is it not direct? I don't think in this topic where there's a fluid dialogue between and much conversation that she was trying to bring these topics up and they were having a back-and-forth topic of it, I don't think it's evidence of direct. What is it? A scientific philosophical discussion? No, it's an engagement and dialogue that's brought up. And Ms. Gessos would bring up conversations, hey, look at Dubai. Can it be construed as racial? Absolutely. Is it ignorant? Yeah. Repeating and you go to the one specific, I guess, the one. Didn't you say that he had a bad experience with some people in the Middle East? That he was angry because he had been screwed by people in the Middle East? Did you say that? He that that was the 2008 conversation about people from Iraq that that about that. So he was so it was brought up in a sense that he was angry at that experience. Correct. Yeah. He was obviously not pleased about that experience. And then he was referencing that categorically for most people who are Arabic or Muslims were like that. Distrustful, always trying to screw you. You disagree with that? I disagree. Yes. That he said that. Well, he your honor said Muslim. And this was he said the people in Iraq with this computer deal ripped him off. And then the dispute of fact, which we can see for the purpose of summary judgment, was Middle Easterners. All Middle Eastern or Middle Easterners screw you, as your honor point out. But there was no reference at all whatsoever at that point about Islam or Muslim. What about the camel jockey, that kind of thing? Never said that. He did not say camel jockey. He didn't say that, that the context of that conversation is, again, this is the very last instance and misguesses. So you dispute a lot of the facts, don't you? Not any of the record. I'm relying upon the record facts, but they're not disputed. I'm relying solely on mostly either undisputed facts in the record or misguesses deposition testimony. So you're saying that the counsel misrepresented the record? Not at all. He didn't say camel jockey. And he didn't say in the context of it was Dubai misguesses approached him and wanted to show. And she consistently says, I want to show off. I wanted to educate him. And also I wanted to let everybody in the workplace know and educate them about Morocco. And so she showed pictures of her cousin's cousin. That's my cousin's cousin lives in Dubai. Misguesses live in Morocco. Look, Mr. Roshanko, and this is in late 2011. Look at these modern skyscrapers and everything else like that. And the deposition of misguesses says in response, Mr. Roshanko said his friend lived there. They're really not that modern. And then he said, you know, I couldn't wait to get home. And he said that they're a bunch of camel people. Obviously inappropriate and ignorant and terrible. He said he said his friends, his friend said that about about the people in Dubai. Yes, absolutely. And I think that's evidence of animals. I think it's evidence of impropriety and ignorance, which is the case. I don't think any of those are inconsistent with animals. Ignorance, impropriety, stupidity, all those things. They all go with the animals. So what have you said is inconsistent with animals? According to I see this. I don't I don't believe it's just animals, given the facts in the fluid nature. You think this was fine? No conversation? No, absolutely not. I don't I don't believe that. What was it? It was inappropriate workplace conversation that shouldn't have happened. So you think you think a reasonable juror could think otherwise? I you wouldn't as a juror, but a reasonable other reasonable juror might think otherwise. Could they think otherwise that it's evidence of a black person working there? You walk to him, say, you know, you know, why do you know black people always steal? I don't think it's but I just heard that. But can you tell us why they steal? And then all of a sudden you start scrutinized in person as a person have to remind you every day that you're scrutinizing because you think that they're a nigger and say it all the time. That's the argument is once you establish the animals based on the ethnicity, then you start scrutinizing based on your alleged mistrust. They're crooks out to screw you. You don't have to every day. I'm doing this, by the way, because I've concluded because of who you are and who who do you believe about what name you call God is why you like this. And that's why I have to do this. Do you have to say it every day that that's what the continuation is? Is it not for the hostile work environment? In this context, without the the nexus, your honor, and just given the right facts. And that's exactly what she said. She's been scrutinized because of distrust. That's what he said. You can't trust these people. You people are going to screw you. And that's directly connected with the distrust based on not what you do, but who you are. And that's what discrimination is about, who you are without any reference to your character, your content or anything, just because who you are, how you believe, what you believe and who you are, the color of your skin, your race, ethnicity, whatever. Your sexual preference makes your work environment hostile. That's the claim is. That's what she alleged. I'll say it's not a factual question. Of course, you don't concede that it's animals. So I understand. I look at it in a temporal context and you're talking about 2008 conversation and you're talking about an individual plaintiff who testified that these conversations happened and they're all laid out factually and then they go through and she testified. Did you ever say to him, hey, I'm uncomfortable. I don't want to talk about Islam or any of these things. And she said no. She testified that she wanted to educate them as to Islam and Christianity. And so that debate occurred. And and then also just wanted to show everybody that they're modern. And she felt that way. And I certainly I can see it and understand that. But there was never any just even a verbal, hey, don't do that. And so you juxtapose that with with fountain glue and all these other cases that stand for the proposition. Look. Yet one of the prong or the prongs is, you know, severe and pervasive and unwelcome. Just even a verbal, hey, I feel uncomfortable about that. But it's undisputed on the record that she she said, look, I didn't tell him that Mr. Shanko that even and this kept going. It never happened after 2011. And there was never any complaint whatsoever about it until 2000, December 6, 2013. And so it's just it's a very unique, overarching, factual situation. And applying the law there. We believe that Judge Lee was spot on in his ruling. And the boy, the fountain blue matter, I mean, a lot of the host work environment combines, you know, the concept of it is a certain threat or intimidation, severe and pervasive prong physicality. And that was just an abhorrent, condensed two day berating of an African-American female waitress or cocktail waitress. And repeated slurs that were awful, spitting in the face and saliva in the face and this yelling. And also combined with, you know, I can get you and saying this the second day as well, when the individual reported it immediately and immediately opposed it. And the bad actor in that case interrupted the meeting with the HR said, I'm going to get you and repeated it. And so it is that the facts here, given that she felt she wanted to educate and she went back and forth. And there is that ignorant statement. And certainly it's it. But I think the facts are distinguishable completely from the decision. And. And found blue and then on yellow here. As to retaliation, that point of appeal. It's undisputed in the record from discusses herself that she says in her deposition transcript. She acknowledges that Excel spreadsheets decrease the need for for the bookkeeper job. Also says that she cannot say that she was consistently busy on a daily basis. And then you also look at. And the reason I think Judge Lee said, you know, this this email, this December six emails, not the smoking gun, you say it is because it's undisputed. Also in the record through interrogatory responses and through depositions that these discussions of the need for the position, just as they always occur, were occurring for years and also in November of of 2012 prior to the meeting. But isn't the timing here a little bit suspicious? You have this conversation between her and her harasser where she finally comes clean and and in tears, complains about what had happened to her in an hour and a half later. You have this email from a supervisor looking around to see if they can find another place for that. Couldn't a reasonable jury conclude that really this is all about retaliation in response to what are lodging a complaint? I mean, they don't have to. But where is the summary judgment state? If if the court applies. Well, if you factor in the record evidence that these conversations were occurring and then apply it foster, I believe it's the interpretation of Nassar that says it's a but for standard for retaliation. But I don't think that a jury could do that. But another point here is there is this is this. I mean, this is a small company. I mean, there don't have to be tons of emails referencing the elimination of a position or something like that. And also just to address, even though it's not on the record. I mean, all sorts of documents and rent rolls were produced and all sorts of other documents. So I just wanted to address that point that we disagree. That other documents weren't produced. OK, thank you. Thank you very much. Mr. Dolly, you have time remaining. Thank you. Just quickly to answer Judge Gregory's inquiry about a constant surveillance stretching to October 2012, it's actually on pages one or three and one of four of the joint appendix, paragraph 19 of affidavit, where she says the surveillance continued until October 2012. All right. So the evidence is in the record. But did you make that point before the district court? I did not make that point at that time. So why should we consider it now? It is a de novo appeal. And the court has to look at the entire record with fresh eyes. And so I believe that at least gives the court an opportunity to. Well, but de novo doesn't mean you get a pass if you don't make the argument that's supposed to have been made in the district court, does it? Does it? I don't, yeah. Probably not. So, you know, the district court focused on these discreet acts with respect to her termination and the other act that I mentioned earlier and found that those weren't sufficiently related to the harassing conduct. And that, do you disagree with that? I mean, that's preserved. So do you disagree with that? I'm sorry, what was the question again? The district court considered your contention that the statute of limitations had been preserved by looking at two discreet acts that occurred within the statute of limitations, the termination and one other. Do you disagree that he was wrong to say that those fell outside of the harassing conduct at issue in this case? I believe so, yes. I believe so on account that, you know, again, just quickly as an aside, the district court also believed that none of the comments were racial or animus in nature. So I don't think the court developed that link between her prior racist comments stretching back about two or three years, which the court simply dismissed as inquiries about Morocco and Islam, and then catching the link that here we have an individual in December 2012, three months before she's terminated, using those prior comments as a basis. What we feel essentially was the trigger that resulted in a termination. So I think if the jury were to look at the collective evidence, which is what they must, I think we can show that link. Now, I brought that argument up to the district court, arguing that the December 6th inquiry to another employer and then the termination followed 85 days later on March 1st, that was all part of a singular link. District court did not think so. We believe it is, considering, again, you know, his past propensity to make racial comments. And considering also more importantly in this case, this is the very individual who used to make racist comments and then also terminated them. So we feel that there is a singular link. There is, you know, we can certainly show. Just also one more thing. I think my, you know, honorable defense counsel kept misapplying the standard for hostile work environment. It's not severe and pervasive. It's severe or pervasive. And the comments that he made in regards to Muslims being terrorists and they're corn men, they certainly qualify as severe or pervasive. Going back to, I believe it was your question, Judge Diaz, in regards to how do I capture this under 1981? Because 1981 is supposedly a race statute, right? And some of these comments, the defendant's content is that some of these comments are not overtly racial in nature. We disagree. The case the Supreme Court actually, which I cited to in my supplemental brief, there the court talked about in looking at race, one has to look at the ethnic characteristics of a group. Now, what are the ethnic characteristics of? I'm sorry. What was the case? What are you talking about? The case I'm talking about, St. Francis versus Al-Khwarizmi, 41 U.S. 604-613. In St. Francis, the Supreme Court said that race is not defined by modern scientific theory. Instead, the congressional intent was to protect people from discrimination based on ethnic characteristics. Now, what are the ethnic characteristics of somebody from the region of Arab? They have a common language. They speak Arabic. They have a common culture. They have a common religion, Muslim. My client is from Morocco. According to CIA World Factbook, 99% of the population from Morocco are identified as Arabic. 99% of the population in Morocco also identify as Muslims. Now, if we were to include, now if those are the ethnic characteristics of my client's race, culture, similar culture, similar language, similar religion, then I believe when he was making those comments, was making those comments about crooks and corn men, that Muslims are crooks and corn men, that not all Muslims are terrorists, but most of them are, and all Muslims speak a secret language, it falls under Section 81 in race. And another case I would like to point out is there was actually a very similar case. This was Sinai versus New England telephone and telephone company from the First Circuit, 3FD471. Here the plaintiff was a Jewish citizen. Now, what do we know about the Jewish state? The Jewish state, or rather the state of Israel, is a Jewish state. It's both, what, national origin and religion. And the plaintiff in there was a Jewish man from the nation of Israel. And the employer there made a discriminatory hiring decision, hiring somebody that was non-Jewish, and also made discriminatory remarks towards the nation of Israel when discussing his evaluation. I think there was a look of disgust on the employer's face when he said, oh, I'm from Israel. The Sinai court, in courting St. Francis, again the Supreme Court case, said that the jury could find that Israel is one of those countries in which the populace is composed primarily of a particular race. It's the same in here. Going back also to the St. Francis case, which talked about that issue was the plaintiff was from Iraq. And the issue in there was, well, is he Caucasian, or is it because he's Iraq he falls into his own category? And that's when the Supreme Court said, well, you know, we're going to look at the ethnic characteristics. And the court said that so long as he was subjected to intentional discrimination based on the fact that he was born an Arab, that he was born an Arab, rather than solely on the place or nation of his origin or his religion, he would have made out a case under 81. So, you know, as we're thinking about it, we all know there is no country called Arab. Mr. Dodd, I think we understand your point, and that red light means you're out of time. I appreciate it. Sorry to interrupt you, but I believe we're done in this case. All right, we're going to come down and greet counsel and then take about a five, ten minute break.
judges: William B. Traxler, Jr., Roger L. Gregory, Albert Diaz